UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 17-CR-00099-WES-PAS |
| FRANCIS SCOTT, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

This Court should sentence the Defendant to a term of imprisonment at the middle of Guideline range and a term of lifetime supervised release. Defendant is before this Court to be sentenced for his crimes, in which, on two separate occasions, he sought out and ingratiated himself with teenaged girls, isolated them, and sexually assaulted them. And, to compound the devastating harm of the sexual assault of each the victims, the Defendant filmed his assaults and saved the videos to allow him to have a permanent record of and to later view his sexual assault and victimization of these girls. The Defendant is a sexual predator who has victimized multiple women, including the minors harmed as a result of the offense conduct in this case. A significant, lengthy sentence is appropriate to punish the Defendant for this serious conduct, to promote respect for the law, to protect the public from him, and to deter him and others who may consider engaging in this conduct.

1

## I.      FACTUAL BACKGROUND

The Defendant has pled guilty to the sexual exploitation of two teenage girls, specifically, that on two separate dates between October 2016 and February 14, 2017, he sexually assaulted two minors, a 15-year-old girl and a 17-year-old girl; that he filmed his assault of them; and that he saved the videos of him assaulting these girls on his cell phone for later viewing.[1]

A.   <u>Offense Conduct – Defendant's Sexual Abuse and Exploitation of Minor Victim #1 (PSR ¶¶ 11-13, 20, 22) and Minor Victim #2 (PSR ¶¶ 23, 26-30)</u>[2]

1.   *Minor Victim #1 (Counts One and Three)*

On February 14, 2017, Minor Victim #1, then a 15 year-old-girl, walked from her school to City Gas, a gas station on Elmwood Avenue, in Providence, Rhode Island. As she walked toward the gas station, the Defendant, who was seated in his vehicle, rolled down his window; told her that he was an Uber driver (he was not); and asked her if she wanted a ride. Minor Victim, having walked a distance in the cold weather, accepted the ride and asked the Defendant to drive her back to her school.

Instead of driving Minor Victim #1 to school as she requested, the Defendant drove out of the gas station in the opposite direction from her school. Eventually, the

---

1 The Offense Conduct is described in the PSR and was summarized at the June 15, 2022 Change of Plea Hearing in the factual basis stated by the Government, and agreed to by the Defendant. <u>See</u> Exhibit 1, Excerpt of Transcript from June 15, 2022 Change of Plea.

2 The videos of the Defendant's assaults of Minor Victims #1 and 2 were made available to Probation, as part of preparation of the PSR (and were made available during discovery). At Sentencing, the Government will have copies of these videos if the Court determines it is necessary to view the videos as part of Sentencing.

Defendant parked behind in a secluded area behind some commercial businesses on Adelaide Street, in Providence (the former Stop and Shop location). Once parked, and hidden from view, the Defendant first tried coax this girl to engage in sex acts with him. When she refused his efforts, he threatened and coerced her. The Defendant first asked Minor Victim #1 to have sexual intercourse with him, which she refused. Minor Victim #1 told that Defendant that she was a virgin and did not know how to have sex. In response to her refusal to have sex, the Defendant took Minor Victim #1's cell phone from her and told her that she would not get it back until she performed oral sex on him. The Defendant told her to "suck my dick." Minor Victim #1 told the Defendant that she didn't know how to do have oral sex, and asked him to drive her back to school. After Minor Victim #1 refused the Defendant's efforts to coerce her into performing oral sex, he asked her for what will be referred to herein as a "foot job," directing her to masturbate him with her feet. The Defendant took his pants down, placed Minor Victim #1's feet on his penis, and used her feet to masturbate to ejaculation.

The Defendant filmed his assault of Minor Victim #1, telling her that he wanted to watch it later. In addition to showing this forced "foot job," in the audio of the video that the Defendant created, Minor Victim #1 can be heard telling the Defendant that she was only 15 years old, expressing that she did not want to masturbate him with her feet, and asking him why he was doing this to her.

After he ejaculated, the Defendant wiped off the Minor Victim #1's feet with a towel and thereafter, drove her to her school, offering her marijuana while he drove. As

3

Minor Victim #1 left his vehicle, the Defendant tried to shake her hand and asked if she wanted his phone number. Minor Victim #1 walked from the Defendant's vehicle, then ran to her school, and reported the assault to her School Resource Officer, which began the investigation.

On February 22, 2017, the Defendant was questioned by police about his assault of Minor Victim #1. Initially, the Defendant didn't understand who the Detectives were asking him about and told them about *another* female who he claimed would allege that he had raped her. After he realized that the detectives were talking about Minor Victim #1, he admitted that he engaged in sex acts were her. The Defendant didn't deny that he engaged in sex acts with a minor. He said that when he saw Minor Victim #1 at the gas station, he thought he would "grab a straggler and get some free head." Although admitting to the sex act with the minor, he lied and victim-blamed. He falsely stated that Minor Victim #1 consented (even though a 15 year old could not consent), and said that it was her idea to use her feet on his penis, claiming that she was into "some freaky stuff."

2.  *Minor Victim #2 (Counts Two and Three)*

While investigating the assault reported by Minor Victim #1, Detectives found a video on the Defendant's cell phone which led to the discovery that the Defendant had assaulted another minor, Minor Victim #2 approximately one to four months before he assaulted Minor Victim #1.

Minor Victim #2, then a 17 year-old-girl, told Detectives that she was acquainted with the Defendant before he sexually assaulted her. She and her friends knew the

Defendant as "Self-Made," and bought marijuana from him.

Minor Victim #2 said that on a date between approximately October 2016 and January 2017, she got into the Defendant's vehicle, expecting that he would drive her from one location in Central Falls to her home in Central Falls. When she entered his vehicle, there were two other passengers, a friend of Minor Victim #2 and an unknown male. The Defendant drove to various locations in the Providence area to sell drugs to other persons, offering Minor Victim #2 and his passengers Hennessy cognac from a bottle while he drove. Minor Victim #2 said that she initially refused the alcohol, but after the Defendant kept pestering her to drink some, she eventually drank from the bottle. Minor Victim #2 recalled that the Defendant held the bottle between his legs before he offered it to her, and that she felt "fuzzy" after drinking. Minor Victim #2 also told detectives that as the Defendant was driving them around Providence, she told the Defendant and the other passengers that she was excited to turn 18 years old in the coming year.

After the Defendant dropped off the other passengers, he continued to drive Minor Victim #2 around Providence, offering her marijuana and demanding sex from her, saying that she wasn't going to get free rides from him. Minor Victim #2 remembered that the Defendant drove her to a dark area, parked the car, and demanded that she have sex with him. When Minor Victim #2 refused, the Defendant demanded oral sex, which she again refused. Minor Victim #2, said that, by this time, she was dizzy, tired, and felt very weak. She said that she would not have been able to walk if she had left the vehicle.

Undeterred by her refusals, the Defendant removed Minor Victim #2's socks; placed her bare feet on his penis; and used her feet to masturbate himself to ejaculation. Minor Victim #2 told police that she remembered that the Defendant held her feet on his penis, and thinks that she was drugged and blacked out, because when she woke, her feet were wet and sticky. Minor Victim #2 told detectives that she had used alcohol and marijuana before and that she thought she may have been drugged by the Defendant because she did not feel like one normally would after using alcohol and marijuana.

The video of Defendant's assault of Minor Victim #2 shows her bare feet on his penis and that when she did not do as the Defendant directed, he moved her feet with his hands, using her feet to masturbate to ejaculation. From the audio, Minor Victim can be heard speaking in a manner that indicates she was impaired.

B. <u>Relevant Conduct Under U.S.S.G. § 1B1.3 and Other Information to Be Considered Under U.S.S.G. § 1B1.4.</u>

As summarized in the Presentence Report (PSR), during the investigation that led to this case, detectives discovered that the Defendant sexually assaulted another 15-year-old girl, one week before he assaulted Minor Victim #1; that he sexually assaulted a 20-year-old woman in 2015; and that he had filmed himself engaging in sex acts with numerous unidentified women, many of whom appear to be unconscious or semi-conscious. PSR, ¶¶ 91, 31-36, 86-90, 24.

The Defendant's sexual assaults on the 15-year-old girl and 20-year-old woman are the basis of pending state charges against the Defendant. PSR, ¶¶ 91, 32-36; Exhibit 2

(Indictment (redacted), State of Rhode Island v. Francis Scott, P1-17-1309A) (RI State Indictment – R.I. v. Francis Scott). The state case charges that the Defendant assaulted four persons: the 15-year-old girl and 20-year-old woman, and Minor Victim #1 and Minor Victim #2,[3] the victims in the federal case.

1.  *Sexual Assault of A 15 Year-Old-Girl (PSR ¶ ¶ 35-36)[4]*

On February 7, 2017, one week before the Defendant sexually assaulted Minor Victim #1, the Defendant picked up D.S., a 15-year-old girl, in his vehicle, having agreed to drive her from an address in Rhode Island to her boyfriend's house in Boston. Similar to Minor Victim #2, D.S. knew the Defendant as "Self Made," and would buy marijuana and get rides from him. Instead of driving D.S. to Boston, the Defendant drove her around Providence, eventually stopping in a vacant lot behind a business on Spooner Street, Providence. When D.S. asked the Defendant why they had stopped, he initially told her that they were waiting for a friend.

While parked in the vacant lot, after unsuccessfully attempting to convince 15-year-old D.S. to be his girlfriend, the Defendant told her that he wanted sexual favors in exchange for having driven her that night and began to touch D.S. in the area of her inner leg, vagina, and breast. D.S. told the Defendant to stop touching her and to take him home, saying "no" and "stop," and asking him "why are you doing this?" D.S told the

---

3 In the pending state case, the Counts 1-3, and 8, relate to the conduct involving Minor Victims #1 and #2, the victims in this case. *See* Exhibit 2, RI State Indictment – R.I. v. Francis Scott.

4 The conduct involving the 15-year-old girl is the basis of Counts 6 and 7 of the pending RI state case. *See* Exhibit 2, RI State Indictment – R.I. v. Francis Scott.

Defendant if he did not stop, she would call 911. When he did not stop, D.S. called 911. During the call, the Defendant persuaded D.S. to hang up. Still, the Defendant did not take D.S. home. The Defendant continued to drive her around and attempted to coerce D.S. to have sex with him and to be his girlfriend in exchange for gifts and shopping excursions. After D.S.'s continued refusals, the Defendant eventually took her home.

2. *2015 Assault of 20-Year-Old Woman (PSR ¶¶ 32-34)*[5]

On November 4, 2015, a 20-year-old woman, Adult Victim #1, reported that she had been sexually assaulted by a man in his vehicle, near Spooner Street and Elmwood Avenue, Providence.[6] Adult Victim #1 told detectives that her assailant, later identified as the Defendant, picked her up at an ATM on Atwells Avenue, Providence and that they drove around Providence for a few hours, eventually stopping in a parking lot near Spooner Street, Providence. (*Note*: D.S. also reported that her February 2017 assault occurred in the area of Spooner Street.) After parking, the Defendant touched the victim in her crotch area, and she told him to stop. The Defendant waited for a short time but then forced himself on Adult Victim #1, pulling her underwear down around her thighs. As Adult Victim #1 tried to stop the Defendant and fight him off, the Defendant began to grab near her breast; held her down; pulled her hair; and attempted to get her clothes

---

5 The conduct involving the 20-year-old woman is the basis of Counts 4 and 5 of the pending RI state case. *See* Exhibit 2, RI State Indictment – R.I. v. Francis Scott.

6 In 2015, the Providence Police Department investigated the victim's report but was unable to identify her assailant. However, in 2017, after the Defendant was arrested for the assault on Minor Victim #1, Adult Victim #1 recognized a photo of the Defendant as her assailant.

off. The Defendant also took her cell phone and refused to give it back (just as he did with Minor Victim #1). According to Adult Victim #1, eventually, the Defendant sat back in his seat, and said that at least Adult Victim #1 was going to "give [him] head," grabbed her by the hair, and forced her to orally copulate him. Adult Victim #1 said she kept making gagging noises so the Defendant would think she was going to vomit, and eventually he let her stop. She said that she eventually was able to open the door and run to Elmwood Avenue, but the Defendant followed her in his vehicle. Adult Victim #1 said that she knocked on several doors on Elmwood but no one would help her. She was eventually picked up by a RIPTA driver and taken to Kennedy Plaza.

3. *Defendant's Cell Phone Contained Videos / Images of Sex Acts with Women Who Appeared to Be Semi-Conscious and Unconscious (PSR ¶ 24)7*

During the investigation that led to this case, Detectives identified a large number of videos and images that showed the Defendant engaging in sexual activity with women who appeared to be unconscious or semi-conscious. (PSR ¶ 24).8

Examples of two such videos are described below:

Video One (1 minute, 52 seconds): The video shows Caucasian woman, who appears to be an adult, with curly blonde hair, wearing a blue shirt, and hoop earrings,

---

7 The videos described in PSR ¶ 24 were made available to Probation, as part of preparation of the PSR (and were made available during discovery). If the Court determines that it is necessary to view these videos as part of Sentencing the Government will have CD with a sampling of these videos available for the Court to view at Sentencing.

8 The Defendant's face is not visible in all the videos recovered from his cell phone, but his face is visible in some of the videos. From a review of these videos, the male depicted in the videos, in which the Defendant's face is not visible, has been identified as the Defendant.

lying on her back on what appears to be the seat of a vehicle. She appears to be unconscious.

The video depicts the Defendant touching the woman's head with his left hand and masturbating himself with his right hand. The Defendant is positioned to the woman's left and behind her. At the beginning of the video, he is masturbating using his right hand and his penis (and hand) are placed inches above the woman's head. As the video continues, at approximately 1:18, the Defendant moves his penis and right hand closer to the woman's nose and mouth, and with his left hand, he pulls her mouth open. At approximately 1:37, the Defendant ejaculated onto her mouth and nose.

Throughout the video, the woman appears to be unconscious and does not respond to the activity described that is captured in the video, with the exception of the following: at approximately 1:04, as the Defendant a moves her chin to open her mouth, the woman's eyes flutter partially open and then close again. Shows adult male hand manipulating her head and opening her mouth and at the beginning, can see the head of his penis near the top of the woman's head, and being manipulated.

Video Two (8 minutes, 11 seconds): The video shows a Black woman, who has a tattoo on her left shoulder. Her hair is pulled back and she is wearing a black top, which is pulled up to show her breasts. She appears to be unconscious through the entire video and does not respond to the activity described. She is lying on her back on the seat of a vehicle. The vehicle console and door are visible at various points in the video.

In the video, based on the visible parts of his body, the Defendant appears to

10

positioned to the left of, and at times, above the woman. At approximately 3:42, the position of the phone changes and for several seconds, the camera angle is facing up towards him and the Defendant's face is fully visible.

Throughout the video, the video shows the Defendant masturbating using his right hand and touching the woman's head with his left hand. At various points, the camera angle changes or zooms in on the woman. The video continues until the Defendant ejaculates on the woman's mouth and face. The following activity occurs at the approximate time stamps  at 36 seconds, the Defendant pinches her nose shut for a few seconds; at various points, including :45, 2:16, 2:45, 5:29, and 6:39, the Defendant puts his penis in the woman's mouth and/or hits his penis against her face; and from 7:02-7:52, the Defendant opens the women's mouth and eventually ejaculates on her face and mouth.

## II.      RESPONSE TO THE DEFENDANT'S OBJECTIONS. [9]

Government has no objections to the PSR.

The Defendant has three objections, each of which should be overruled by this Court. The Government agrees with and joins in the Response of the Probation Department, *see* ECF 78-1, Addendum to PSR, as to each of the Objections, and submits the additional response.

A. Some of The Objected-To Information Is Properly Included in the PSR and

---

[9] If necessary to resolve any objections, the Government will have CD with a sampling of these videos available for the Court to view at Sentencing and will have a witness available to testify as to the victim statements relating to victims in the instant case and the victims in the state case.

Considered By This Court Under U.S.S.G. § 1B1.3.

For certain offenses, including Count 3, Possession of Child Pornography, to which the Defendant has pled guilty, relevant conduct includes "all acts and omissions described in subdivisions (1)(A) and (1)(B) above *that were part of the same course of conduct or common scheme or plan as the offense of conviction. See* U.S.S.G. § 1B1.3(a)(2) (emphasis added). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least *one common factor*, such as common victims, common accomplices, *common purpose, or similar modus operandi.*" U.S.S.G. § 1B1.3, cmt. n. 5(B)) (emphasis added).

For Counts 1 and 2, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A).

The Defendant has pled guilty to the sexual assault and exploitation of two girls (Minor Victims #1 and 2) on dates between October 2016 and February 14, 2017, and to using his cell phone to video his sexual assault of each victim. (Counts One and Two). The PSR describes, and at the Change of Plea, the Defendant has admitted that leading to each assault, the Defendant offered each of these minor females a ride in his car, and after they accepted the ride, he drove them around the Providence area before parking in a location where he assaulted each of them. *See* PSR, ¶ ¶ 11-30; Exhibit 1, Excerpt of Transcript from June 15, 2022 Change of Plea, pp. 19-21, 17-18. The Defendant has also pled guilty to retaining these images and storing them on his cell phone (Count Three).

As to Count 3, the Defendant has admitted that:

> on or about a date unknown but not later than October 1, 2016 and continuing through on or through February 22nd, 2017, Defendant, Francis Scott, knowingly possessed the Samsung Galaxy Note that I described in Counts I and II, and that Samsung Galaxy Note contained visual depictions, specifically videos, of minors engaged in sexually-explicit conduct . . . . and the visual depictions were the videos that I've just described that were created with Minor Victim #1 and Minor Victim #2 . . . .

Exhibit 1, Excerpt of Transcript from June 15, 2022 Change of Plea, pp. 19-21. The video of the assault of Minor Victim #2 indicates that Minor Victim #2 was impaired during the assault. PSR, ¶ 23 ("The female's face is not visible in the video, but she can be heard making sounds and speaking in a manner that Detectives believed indicated that she may have been impaired.") Further, Minor Victim #2 told investigators that she believed that she had been drugged prior to the Defendant's assault on her. PSR, ¶28 (K.E. [Minor Victim #2] said that she knew how she should feel from both alcohol or marijuana and that the dizzy feeling she had after drinking and smoking with SCOTT was very different. K.E. said she thought she had been drugged."); PSR, ¶¶ 26-28. Also, after filming his assault on Minor Victim #1, the Defendant told her that "told her he filmed it so he could "'watch it later.'" PSR, ¶ 12.

PSR ¶¶ 31, 35-36, to which the Defendant objects, describe the sexual assault committed by the Defendant of 15-year-old D.S. The Defendant's assault on D.S. is relevant conduct under U.S.S.G. § 1B1.3(a)(2), as part of the same course of conduct or common scheme or plan as the offenses of conviction. The assault on D.S. occurred shortly after the assault on Minor Victim #2 and one week before and under similar

circumstances of his assaults of Minor Victims #1 and 2.

PSR ¶ 86, to which the Defendant objects, relates to state charges filed, dismissed, and thereafter presented by indictment involving Minor Victim #1. PSR ¶¶ 86, 91 The Defendant's conduct described in PSR ¶ 86 is relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A) as "acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."

B. <u>The Objected-To Information Is Properly Included in the PSR and Considered By This Court Under U.S.S.G. § 1B1.4.</u>

All of the objected-to information in the Defendant's Objections 2-4 is properly included in the PSR and considered by this Court under U.S.S.G. § 1B1.4, which provides that:

> In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, *without limitation, any information concerning the background, character and conduct of the defendant*, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.

U.S.S.G. § 1B1.4 (emphasis added).

Further, the Defendant's assault of K.F., PSR ¶¶ 31, 32-34; his possession of the videos of him engaging in sex acts with semi-conscious and unconscious women, PSR ¶ 24; and his dated criminal arrests, PSR ¶¶ 83-85, are properly considered under U.S.S.G. § 1B1.4.

Finally, without legal support, the Defendant has objected to the inclusion of information relating to the charges in the state case based on a potential impact to the Defendant's Bureau of Prisons classification. Defendant's objection is contrary to U.S.S.G.

§ 1B1.4 and the goals of sentencing, in 18 U.S.C. 3553(a) which seek to ascertain fulsome information as to the history and characteristics of the Defendant.

III.   SENTENCING ARGUMENT

Although this Court may not presume that a guideline-range sentence is reasonable, the Guidelines remain a significant and pivotal component at Sentencing, and the starting point of the sentencing process. "Before imposing a sentence, the district court must calculate the sentencing guideline range, which serves as a starting point and the initial benchmark, but which may not be presumed reasonable." *United States v. Benoit*, 975 F.3d 2020, 24-25 (1st Cir. 2020) (affirming a sentence of 156 month sentence for transporting and possessing child pornography) (citations and quotation omitted). After determining the sentencing range, the Court "evaluates the defendant's conduct and history through the prism of the sentencing guidelines range and sentencing factors to select a sentence from the universe of reasonable sentencing outcomes." *Id*. (quotations and citation omitted). While directed to consider all of the sentencing factors, the Court has discretion as to how it choose to weight the various sentencing factors. *Id*.

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the

defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). The section 3553(a) factors support.

Based on all of the 18 U.S.C. § 3553(a) factors, the Government recommends that the Defendant be sentenced to a term of imprisonment at the middle of Guideline range, followed by a lifetime term of supervised release. This sentence is "sufficient, but not greater than necessary" to achieve the goals of sentencing, and is consistent with sentences in other cases in this District involving the sexual exploitation of children.[10] The information presented by the Defendant to Probation does not support a downward variance.

1. <u>Nature and Circumstances of the Offense and History and Characteristics of the Defendant.</u>

---

[10] *See e.g.*, *United States v. Gaccione*, 977 F.3d 75 (1st Cir. 2020) (DRI Docket 17-00004-JJM-LDA) (affirming a 2,160 month sentence for production of child pornography, and distribution and possession, for a father who abused his teen daughter and produced child pornography over a period of years); *United States v. Goodman*, Cr No. 18-141 JJM (defendant sentenced to 260 years after production of materials of him abusing his two daughters from ages 3.5 weeks to 1.5 years old, and 6-12 years old, respectively, and child of a friend from ages 6-9 years old); *United States v. Cortes*, Cr No. 18-0069-WES-LDA (defendant sentenced to 35 years imprisonment; production of child pornography involving a girlfriend's young child and possession of child pornography); *United States v. Crisostomi*, Cr. No. 12-166-JJM (defendant sentenced to 35 years imprisonment after creating videos of him receiving oral sex from his 7-year-old daughter); *United States v. Keener*, Cr. No. 13-175-JJM (defendant sentenced to 24 years imprisonment after producing images and videos of him engaged in sexual contact with the 7 year old daughter of his girlfriend, including touching her genitalia and the defendant masturbating onto her); *United States v. Rafael Leal*, Cr. No. 16-111-WES (defendant sentenced to 19.5 years imprisonment after having sex with a 14-year-old girl he groomed over the internet); *United States v. Jordan Monroe*, Cr. No. 16-55-WES ( defendant sentenced to 40 years for production of child pornography documenting him violently raping unconscious minor over multi-year period, as well as possession of child pornography); *United States v. Robert Barrie*, Cr. No. 17-93-WES (defendant sentenced to 20 years for production of materials showing him molest his 16 year old step daughter (who disclosed he began molestation at age 13)); *United States v. Donald Jones*, Cr. No. 11-82-WES (defendant with prior molestation conviction sentenced to 50 years imprisonment after travelling to Rhode Island to have sex with a minor in a sting case)

Although this Court must consider other factors beyond the Defendant's offense conduct, this Court should nonetheless give significant weight to the nature and circumstances of the offense in determine the Defendant's sentence.

Without regard to Minor Victim #1's refusals and protests for him to stop, her age, and her pleas for him to take her back to school, the Defendant showed a complete lack of decency and basic humanity, when he used her to masturbate himself to ejaculation, as he effectively imprisoned her in his car. One can only image the terror that this 15-year-old girl felt as the Defendant drove out of the gas station and her away from her school, into an isolated parking lot, and then forced her to engage in sex acts with him, which she knew were being filmed for later viewing. As shocking as the facts relating to Minor Victim #1's assault are, the totality of the facts of this case plummet to depths of depravity when the assault of Minor Victim #2 is also considered. Only months before the Defendant assault Minor Victim #1, he committed similar assault on Minor Victim #2, a person with whom he had ingratiated himself by selling her drugs and offering her rides. However, to ensure that he was able to assault her, the Defendant drugged her and while she was incapacitated in his car, he assaulted her and filmed it.

As shown on the timeline below,[11] in a fifteen month period, between November 2015 and February 2017, the Defendant committed four sexual assaults on females in his car – one adult and three minors. His conduct is depraved and he is a dangerous predator.

_____

11 The victims in this case in the darker shade.



The information available to the Court shows that the Defendant is a dangerous sexual predator who has not only victimized Minor Victim #1 and #2 in this case, he has also assaulted the other known victims (charged in the state case), K.F. and D.S, *and* he has sexually assaulted other, unknown women, who appear to be unconscious and/or semi-conscious and filmed his sexual assaults of these women.

The Defendant's description of his childhood indicate that he overcame a number of obstacles and suffered some trauma as a child. However, the circumstances presented by the Defendant do not support a downwards departure. The suggestion that any sexual abuse he experienced at ages 14-15, approximately 20 years before the instant offenses, is causally related to his sexual exploitation of multiple girls, is so utterly speculative that this Court should disregard it. *See United States v. Fuentes-Moreno*, 954 F.3d 383, 395 (1st Cir. 2020) (noting that a sentencing court may consider any information provided it has sufficient indicia of reliability) (collecting cases); U.S.S.G. §6A1.3(a) ("[Courts] may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). Further, even if the Court were to accept

18

the Defendant's disclosure as true, there are serious limitations to the male sexual abuse victim-offender cycle that has been popularized as an explanation of why some males sexually offend. [12] In short, Defendant's recent abuse allegations, even if true, neither excuse his behavior nor mitigate against a Guidelines sentence.

In addition to the instant offense conduct, the Defendant's other sexual predator

---

12 *See, e.g.*, Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in *Sex Abuse: A Journal of Research and Treatment* 14(1) (2002) at 43. "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations." Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in *Child Abuse & Neglect* 20(3) (1996) at 230; Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in *The British Journal of Psychiatry* 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"). Although some studies suggest that prior victimization may have some effect in a minority of cases, "[a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy." Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in *The British Journal of Psychiatry* 179 (2001) at 488; *see also*, Hall, R.C.W., "A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues" in Mayo Clinic Proceedings 82(4) (2007) at 464 ("There is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves. These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."); Haywood, Thomas et al., "Cycle of Abuse and Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents" in *Child Abuse & Neglect* 20(12) (1996) at 1234 ("Studies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child. Variability in prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories. . .") (citations omitted); Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in *Child Abuse & Neglect* 20(3) (1996) at 232 ("Perpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children. . . Excuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers).") . When held to a polygraph examination, the share of offenders who experienced sexual victimization in their own lives drops significantly. Hindman, Jan et al., "Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy" in *The Sexual Predator* (vol. IV) (2010) at 20-5; *see also* Hindman, Jan et al., "Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders" in Federal Probation 65(3) (2001) at 8.

activity – his assaults on K.F and D.S., and his assaults on the unconscious and semi-conscious women support the recommended sentence.

2. <u>Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.</u>

No one can credibly contest the seriousness of the Defendant's crimes, and the need for the sentence to reflect the seriousness of the offense, as well as to promote respect for the law and provide just punishment. The Defendant sought out and victimized two minors, so he could use them for his sexually deviant interest.. Separate from his hands-on abuse of these girls, the Defendant created a permanent record of his victimization of them. Apparently not sated by his abuse of them for his sexual pleasure, the Defendant filmed his assaults to allow himself to relive the encounters, thereby further victimizing these girls.

It is axiomatic that hands-on sexual abuse inflicts upon its victim enormous, devastating, and long-lasting harm. That the abuse is inflicted on a child, a teenager, adds a devastating dimension to the harm ordinarily inflicted on sexual assault victims. As the Supreme Court explained while addressing an Eight Amendment challenge to capital punishment for the rape of a child by her stepfather in *Kennedy v. Louisiana*:

> [...] the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood.... Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

554 U.S. at 435 (citing various studies). Those years of anguish can include sudden school

20

failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. *Id.* at 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting).

No one knows for sure when, where, or how the damage from Defendant's abuse will manifest itself as Minor Victims #1 and #2 move through young adulthood. But one thing is certain—these victims, now young women, faced a traumatic, sexual assault before either reached adulthood – and under circumstances that are truly the stuff of nightmares. The Defendant's actions violated federal law, but they also transgressed every conceivable normative principle undergirding our laws. His conduct is repugnant to any conception of the good embraced by our community. This Court's sentence must express an appropriate level of social condemnation of his crimes.

3. <u>Protect the Public from and Deter the Defendant From Further Crimes.</u>

A significant sentence is also warranted to "protect the public from further crimes of the Defendant" and to deter this Defendant and others from similar conduct in the future. Deterrence is important for crimes involving the sexual abuse of children. *See United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *See id*. The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class…" *Smith v. Doe*, 538 U.S. 84, 103 (2003). The Defendant fits well within that class. Defendant's

repeated sexual exploitation evidences a high probability of recidivism if this Court allows him the chance to reenter society. A strong need thus exists to protect children in the community from the Defendant — now and well into the future.

4. <u>A Lifetime Term of Supervised Release is Necessary and Appropriate in This Case.</u>

Whatever the sentence imposed by this Court, the United States submits that a lifetime term of supervised release is necessary for this Defendant.

Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. *United States v. Granderson*, 511, U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, if it served the just deserts function as well, there would be no need to put most criminals in prison we could put them on supervised release instead. *United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010).

For the offenses of which the Defendant stands convicted, the Guidelines recommends a lifetime term of supervised release. USSG § 5D1.2(b)(2). The life term recommendation contained in Section 5D1.2(b) reflects powerful evidence indicating that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate and directly inserted such a recommendation into the

22

Guidelines. *Id*. More specifically, passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. H.R. CONF. REP. NO. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 684. This Defendant is certainly one of the offenders who requires lifetime supervision.

IV.    CONCLUSION

For the reasons stated above, the Government's urges the Court to impose the sentence recommended by the Government.

Respectfully submitted,

ZACHARY A. CUNHA
UNITED STATES ATTORNEY

DENISE M. BARTON
Assistant U. S. Attorney
U. S. Attorney's Office
One Financial Center Plaza, 17th Floor
Providence, RI 02903
401-709-5000
denise.barton@usdoj.gov

## <u>CERTIFICATION OF SERVICE</u>

On this 22nd day of March 2023, I caused the within GOVERNMENT'S SENTENCING MEMORANDUM to be filed electronically and it is available for viewing and downloading from the ECF system.

<u>/s/Denise M. Barton</u>
DENISE M. BARTON
Assistant U.S. Attorney
U.S. Attorney's Office
One Financial Center Plaza, 17th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email: denise.barton@usdoj.gov

24